**Affirmed and Memorandum Opinion filed April 18, 2019.**



In The

# Fourteenth Court of Appeals

NO. 14-18-01019-CV

## IN THE INTEREST OF C.G., B.G., AND G.G., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-05425J**

## M E M O R A N D U M   O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1). The children are Chris, Bret, and Greg. The parents are L.M.M. (Mother) and E.J.G. (Father).[1] Father died after this case began but before the decree was signed. The trial court terminated Mother's parental rights and appointed the Texas Department of Family and Protective Services (the Department) to be the children's managing conservator.

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

On appeal, Mother challenges the sufficiency of the evidence to support termination. We conclude legally and factually sufficient evidence supports the trial court's findings that Mother endangered her sons and that termination of her parental rights is in the boys' best interest. Therefore, we affirm the trial court's decree.

## BACKGROUND

### A.  Removal

The Department received a referral in August 2017 alleging Mother and an unknown person were using and selling methamphetamine out of their home, creating an unsafe living situation for the three boys. At that time, Chris was almost 13, Bret was almost 12, and Greg was almost nine. (Mother's eldest son, who was 17 at that time, is not involved in this case.) The Department had investigated Mother three times in the past; each investigation involved her drug use.

The Department tried to contact Mother for the next ten weeks. Caseworker Courtney Yoak was assigned to the case about halfway through that period. Yoak believed Mother was evading her. Though she could not contact Mother, Yoak located and met with the boys at their respective schools to ensure their well-being.

In mid-November, Yoak learned Mother had recently been arrested for two felony drug offenses but was free on bond. Yoak was again unable to get in touch with Mother but learned she was staying with a man named Zeke. A background check revealed Zeke had extensive criminal history involving drugs and injury to a child. Yoak also learned Mother had gone to Greg's school to have lunch with him, at which time school personnel believed she was under the influence of drugs or alcohol. Yoak spoke to Father and told him she believed the children were not safe with Mother. Father expressed no interest in taking the children.

Based on Mother's failure to cooperate with the Department, her history of

drug abuse, and her living with Zeke, the Department removed the three boys. Ten minutes after Yoak left a message stating the boys were being removed, Mother called Yoak wanting information.

The Department filed this suit the next day. The trial court conducted an emergency removal hearing and appointed the Department as the boys' temporary managing conservator.

## B.    Family service plan

Following a full adversary hearing, the trial court signed an order requiring Mother to comply with any family service plan by the Department. The service plan would identify the goals she needed to achieve and tasks and services she needed to complete before her sons could be returned to her care.

Mother's service plan required her to, among other things: participate in random drug testing; undergo a psychological assessment and follow the assessor's recommendations; participate in therapy consistently if therapy is recommended; complete a substance abuse assessment and follow the assessor's recommendations; participate consistently in substance-abuse therapy; complete parenting classes; participate in all visits, court hearings, and permanency meetings; show proof of income demonstrating the ability to support her children financially; and show a safe and stable home environment with functioning utilities.

## C.    Trial

### 1.    Evidence about Mother

#### a.    Drug use

Mother tested positive for drugs when each of her three sons was born. When Chris was born in 2004, she was reportedly positive for marijuana, but the Department could not locate Mother to investigate the allegation. She was positive

for marijuana just over a year later when she gave birth to Bret; Bret also had marijuana in his system. Finally, both Mother and Greg were positive for cocaine when Greg was born in 2008.

Mother was ordered to submit to drug testing immediately after several hearings in this case. She complied with the order only twice: in November 2017, shortly after this case began; and in April 2018. The first test revealed she was positive for amphetamine, methamphetamine, and marijuana. The second yielded a positive result for amphetamine and methamphetamine, both at higher levels than those of the first test, as well as benzodiazepine. Mother refused to be tested in December 2017, twice in January 2018, and once in August 2018. Each of those refusals to submit to testing is deemed a positive result under Department policy.

At a December 2017 hearing, the transcript of which was admitted into evidence at trial, Mother testified she had used methamphetamine "maybe a handful of times" in the previous five years. At trial in October 2018, when asked if she had used methamphetamine more than 20 times since Chris was born, she said "of course." When asked if she had used more than 50 times, she said "possibly." She testified she completed drug rehabilitation after Greg, her youngest child, was born and was sober for about two years. She said she relapsed in 2011 or 2012, then re-achieved sobriety in 2014 for "about a year." She could not say how many times she had used methamphetamine since her relapse. Mother testified she did not use methamphetamine during the 10-week period in which the Department was looking for her, but she admitted she used it after her children were removed. The written report of an April 2018 psychological evaluation of Mother reflects she reported similar information about her drug use. The report states: "Patient reports using meth since 2013, stated that she was clean since November but relapsed last month. Stated that she was stressed due to the cps cas[e] and not seeing her children."

4

Mother acknowledged at trial that she has an addiction problem. She testified about her efforts to be admitted to an inpatient drug treatment program, first on her own and then with the Department's help:

> I tried for two months prior to asking CPS for help. I tried to get into a inpatient on my own where I cannot, because I don't have health insurance. They were telling me I had — there was a long waiting list. When I came to court in June, actually is when I asked Ms. Walker [caseworker Keverlyn Walker] for help to get me in. I was willing to go that day. She said what if I could go to Dallas, I said that's fine. Anywhere, you know. And I never heard anything from that afterwards.

When asked how methamphetamine impacts her, Mother answered, "I mean, I'm here."

### b.    Criminal history

Mother's criminal history as reflected in the record is entirely drug-related. She pleaded guilty in 2016 to possession of less than one gram of methamphetamine and was sentenced to serve 90 days in jail. The record suggests she was convicted of possession of a controlled substance a second time in 2016, but no judgment or other documentation regarding such a charge appears in the record. The arrest that led to the Department finding her in November 2017 was also drug-related. She was taken into custody on two felony charges of possession of a controlled substance, for which she testified she "signed for four years deferred."

### c.    Relationship with Zeke

Mother had known Zeke for five or six years when this case began. The record does not indicate how long she and Zeke had dated. Mother testified she and Zeke never used methamphetamine together. She knew he had criminal history but did not know the extent of it. The record reflects three criminal offenses committed by Zeke between the years of 2000-2009.

Beginning in 2015, Zeke's criminal activity increased in frequency. In June of that year, he kicked a box of glass at two members of his family, including a child under the age of 15. He was charged with assault of a family member and injury to a child. He pleaded guilty to the assault charge and was placed on deferred adjudication community supervision for two years. As a result of that disposition, the State dismissed the companion case of injury to a child. Zeke violated the terms of his community supervision, so seven months later the trial court adjudicated him guilty of assault of a family member. He was sentenced to serve 90 days in jail. Shortly after this termination case began, Zeke was arrested for possession of between four and 200 grams of methamphetamine. He pleaded guilty in mid-2018 and was placed on deferred adjudication community supervision for three years.

### d.    Willingness and ability to parent

Mother testified she had been working for two years at a company that manufactures and installs waterfalls and fountains, answering phones and scheduling appointments. That company is owned by Zeke's mother, Jenny. Jenny testified Mother is a good employee. Mother said she works approximately 30 to 35 hours per week, and she believed she could support her children financially. However, the written report of Mother's psychological evaluation, conducted six months before trial, states Mother said she was "currently unemployed." In addition to working for Jenny, Mother lived on Jenny's property. Mother and Zeke shared a three-bedroom garage apartment on property owned by Zeke's parents.

The psychological report describes some aspects of Mother's mental health:

Patient was emotional and tearful during the interview, thinks that the system has not been fair to her since her hair follicle tested positive for meth. Stated that she has [history] of depression, used to take prozac which was managing her symptoms, off medication since 2010 due to no healthcare coverage. Currently experiencing sad feelings low

6

energy, lack of motivation, unable to focus, racing thoughts and issues with sleep. Patient also endorses mood swings, irritable mood, but denied anger outburst. Denied grandious [sic] behavior, mania, elevated expansive mood and rage[.] Patient scored 7 on PHQ 9 questionnaire for depression. Recommend drug rehab, individual therapy for mild depression and parental class.

The evaluator characterized Mother as "very guarded throughout the interview, weighing answers and answering them with the minimum of possible information. At times, conflicting information was given." The evaluator also noted Mother's insight and judgment were both poor.

### e.    Service plan

Caseworker Keverlyn Walker testified Mother completed her psychological evaluation but did not complete the remainder of her family service plan. Specifically, Mother did not report for random drug testing, begin substance abuse outpatient treatment, participate in conferences or meetings requested by the Department, attend all court hearings, or remain in contact with the Department. Walker acknowledged at least one missed drug test was due to her being given incorrect information about where to report. She further acknowledged Mother appeared for a counseling session only to find out it had been cancelled. Although Mother testified she had been working for two years, Walker said Mother did not tell her she was employed, nor did she provide documentation of employment to the Department. Mother responded that Walker never asked for that documentation, and her service plan with that requirement was made by a different caseworker.

### 2.    Evidence about the children

Walker described the boys' life with Mother as "very chaotic" due to their life-long exposure to criminal conduct and drugs. Chris, Bret, and Greg were placed together in a foster home when they were removed. The placement was going well

until Mother started to appear around the boys' schools and neighborhood. The foster parent filed a police report. Out of concern for the boys' safety, they were moved from that foster home into two foster homes; Chris and Greg were placed in one and Brett was placed in the other. The brothers visited each other every weekend and sometimes during the week.

Meanwhile, the Department was conducting a home study regarding the boys' older half-sister (Father's eldest daughter), Pam, who was 21 or 22 years old, and Pam's mother, Susan. Pam lived with Susan. The home study was approved, and the boys were placed with Pam and Susan about four months after their initial removal. They remained in that placement through trial.

The boys' Court Appointed Special Advocates (CASAs) wrote a report that was admitted into evidence at trial. Written just before trial began, the report states Pam was nearly finished with the process of becoming a licensed foster parent. The CASAs described the boys as "extremely bonded" with Pam. Each boy was said to have expressed his desire to live with and be adopted by Pam.

However, when trial began, there was some confusion about the boys' desires. Caseworker Walker testified the boys wanted to be adopted by Pam. The trial judge stated:

> I think the only time that I heard this case, someone told me that the kids don't want to be adopted. Now one of the things that — you mentioned best interest — is when children can actually say what they want, that that's something to be considered. I didn't make it up because I wrote it down. I only write things down that I think are significant. . . . In fact, I wrote down that the child was [Chris] and he was 14.

The trial judge recessed the trial to speak with Chris about where he wanted to live.

Trial resumed five days later. The record suggests the trial judge interviewed the boys but is silent as to the substance of any such interview. Walker confirmed

her earlier testimony that the boys want to be adopted, then explained the confusion:

Q.   . . . Initially, the boys were hoping that their parents would get it together for once and they didn't want to be adopted, correct?

A.   Correct.

Q.   That didn't happen during the year of this case, right?

A.   No, it didn't.

Q.   All right. Now they want to stay in their current placement.

A.   Semi.

Q.   Well explain.

A.   They want to — they honestly want to be placed with [Pam]; however, if they can't be placed with [Pam] or adopted by [Pam], they want to stay with their current placement [Susan's home].

Walker testified the boys were doing very well with Pam and Susan. None of the boys had educational or behavioral problems. Each was on track developmentally. All their needs were being met. Walker described them as "typical siblings, fighting and stuff like that." Once the three brothers were reunited after their separation into two foster homes, she testified, "their behaviors have really took like a 360." Walker said the Department believes it is in the boys' best interest for Mother's parental rights to be terminated.

One of the CASAs, Kristin Woods, testified she also believed termination of Mother's parental rights was in the boys' best interest. She explained:

I have seen them about once a month, sometimes twice a month since February. The very first visit that I had with them was prior to their placement with the current caregivers. So I first met them with the previous caregivers and have seen the progress that they've made physically, emotionally, socially. They're happier. They're more relaxed. They are all doing very well in school. The oldest is in the eighth grade and has been considered for Pre AP classes at age 14 in

eighth grade, which is amazing. Two of them are playing sports. They're significantly better well behaved, better behaved.

Kristin testified the boys told her they want to keep in touch with Mother but "they realized and understand that on a day-to-day basis that their care and well being would be better with someone else."

### 3. Trial court's findings

The trial court found Mother engaged in the conduct described in subsections D, E, and O of section 161.001(b)(1) of the Family Code. The court additionally found termination of her parental rights was in Chris', Bret's, and Greg's best interest. The trial court appointed the Department to be the boys' managing conservator. Mother timely appealed.

## ANALYSIS

## I. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex.

10

Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.    Predicate ground for termination: Endangerment (161.001(b)(1)(E))

Mother challenges the sufficiency of the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1) of the Family Code. We conclude the evidence is legally and factually sufficient to support the finding of endangerment under subsection E. Accordingly, we do not review the findings regarding subsections D and O. *See A.V.*, 113 S.W.3d at 362.

### A.    Legal standards

Family Code section 161.001(b)(1)(E) requires clear and convincing evidence

the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment requires evidence the endangerment resulted from the parent's conduct. *S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the

12

possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.— Houston [1st Dist.] 2006, no pet.) (en banc). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

## B. Application

Mother's long history of drug abuse is undisputed. She reportedly tested positive for marijuana when she gave birth to Chris in 2004. When Bret was born just over a year later, both Mother and baby were positive for marijuana. Greg was born positive for cocaine in 2008; Mother tested positive as well.

Mother's criminal history is related to her drug abuse. She pleaded guilty at least twice to possession of methamphetamine. She was sentenced to serve 90 days in jail for the first conviction; she accepted three years' community supervision in exchange for her guilty plea on the second.

Mother testified she completed drug rehabilitation programs after Greg was

13

born and stayed sober for several years before relapsing. She said she re-achieved sobriety but relapsed again. Mother admitted she used methamphetamine after her children were removed. She acknowledged her addiction at trial as well as her attempts to take part in another rehabilitation program.

The trial court was free to discredit her self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109 (fact finder is sole arbiter when assessing credibility and demeanor of witnesses). Moreover, substance abuse is "hard to escape," and the fact finder is "not required to ignore a long history of dependency . . . merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.— Houston [14th Dist.] 2003, pet. denied). The trial court may reasonably decide a parent's changes before trial are too late to impact the best-interest decision. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied). Although a reasonable fact finder could look at Mother's attempts at sobriety and decide they justified the risk of keeping her as a parent, we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring in judgment).

Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Mother engaged in conduct described in subsection E. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Mother endangered Chris, Bret, and Greg. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding regarding subsection E. We

overrule Mother's first, second, third, and fourth issues.

## III. Best interest

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of parental rights is in her sons' best interest.

### A. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in its best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex.

Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

## B.    Application

### 1.    Children's desires and needs

None of the boys testified. Earlier in the case, it appeared at least one of them stated he did not want to be adopted, reportedly because he believed it was a possibility that they could return to Mother's care. According to both the caseworker and the CASA, at the time of trial the boys wanted to be adopted by Pam. If they could not be adopted by Pam, they wanted to stay in their current placement with Susan and Pam. They wanted to keep in touch with Mother, but they understood it was not in their best interest for Mother to have day-to-day responsibility for them.

Walker believed Pam and Susan were meeting all of the boys' physical, emotional, social, and educational needs.

### 2.    Stability of proposed placement

The record reveals little about Pam and Susan's family and home. Walker and Woods both testified they were happy with that placement for the boys.

### 3.    Predicate ground of endangerment

Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the children's best interest. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). Accordingly, the evidence of Mother's endangerment of her sons, discussed above, is relevant to the best-interest analysis.

### 4.    Service plan

Mother did not complete her service plan. She did not report for random drug

testing or begin substance abuse outpatient treatment, nor did she participate in meetings requested by the Department, attend hearings, or remain in contact with the Department. At least some of Mother's failures to complete her services were beyond her control, including one missed drug test and one missed counseling session. Mother and Jenny both testified Mother worked for Jenny's company and lived in an apartment, but Mother did not provide proof of employment or residence to her caseworker.

### 5. Willingness and ability to parent

Mother testified she has worked 30 to 35 hours per week for two years. She said she would be able to support the boys financially. She also stated she has a place for them to live.

The record contains little to no evidence about Mother's mental willingness and ability to parent, but there is evidence of her mental state generally. The psychologist who evaluated her stated she is mildly depressed and would benefit from drug treatment, individual therapy, and parenting classes. The same evaluator noted Mother has poor insight and judgment.

### 6. Programs available

There is no evidence about specific programs available to assist Mother in parenting the boys. There is some evidence about Mother's desire to enter into a rehabilitation program and the Department's willingness to help her in that endeavor.

### 7. Acts or omissions and any excuses for them

Mother offered no excuse for her use of drugs before her children were removed. She said she used methamphetamine after the boys were removed because she was stressed.

## C.    Conclusion

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of Chris, Bret, and Greg. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination of Mother's rights was in her sons' best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's fifth issue.

## CONCLUSION

We affirm the trial court's final decree.

/s/     Tracy Christopher
Justice

Panel consists of Justices Christopher, Hassan, and Poissant.

18